## CHARLESTON.

THOMAS H. GARRETT v. T. E. KIRTLEY, ADMR., ETC., et al..

Submitted October 28, 1924.   Decided November 11, 1924.

> HUSBAND AND WIFE—*Reconciliation and Agreement to Resume Cohabitation Held Not to Warrant Cancellation of Separation Contract on Wife's Death Before Resumption of Cohabitation.*
>
> While living separate and apart, a husband and wife execute, acknowledge and record a contract whereby the husband in consideration of bank stocks delivered, and in consideration of the wife's release of claims of every character against his real and personal property then owned or thereafter acquired, and in consideration of release from his duty to support and maintain her, on his part releases to her and her heirs all claims he has upon her real and personal property then owned or thereafter acquired. About eighteen months thereafter they effect a reconciliation, and agree to begin to live together as man and wife in the near future. They do not live or cohabit together but intend to do so, pending which understanding the wife died. These facts and circumstances will not warrant a court of equity in decreeing a cancellation of the contract.

Appeal from Circuit Court, Cabel County.

Suit by Thomas H. Garrett against T. E. Kirtley, administrator, etc., and others.   Decree of dismissal and plaintiff appeals.

*Affirmed.*

*Warth & Peyton,* for appellant.
*Simms & Staker* and *George S. Wallace,* for appellees.

LIVELY, JUDGE:

The plaintiff, Thomas H. Garrett, and Mary Alva Kirtley were married in the year 1899 at Hurricane, West Virginia; later moved to Ohio where they accumulated some money in the millinery business, and in 1909 came to Huntington, West Virginia, where they had purchased various city lots, three of which were deeded to the wife, Mary Alva Kirtley. A dwelling was erected on one of the lots deeded to her on Fourth

Avenue, where they resided until some time prior to September 1919, when they separated. Plaintiff had been engaged in the real estate business in Huntington. The wife continued to reside in the house on Fourth Avenue. Being in ill health, she went to Cincinnati, Ohio, early in 1921 and remained there under medical treatment for about six months, when she returned to Huntington, West Virginia, in May or June. In July she visited friends in Charlottesville, Virginia, returning to Huntington in September of that year. On December 18th, after a short illness followed by a surgical operation, she died intestate.

Plaintiff, the husband, instituted this suit against her personal representative, heirs and distributees, claiming curtesy in the real estate, and claiming the personal estate under the statute of descents and distribution. The bill also claims that plaintiff is entitled to one-half of the real estate in fee because he furnished one-half of the purchase money, the wife holding the legal title as trustee for him to that extent. This latter contention seems to have been abandoned; and the controversy is narrowed down to his claim of curtesy, and right to the personal estate. Defendants answered and set up as a bar to plaintiff's claims a contract between plaintiff and his decedent wife duly acknowledged and recorded, dated September 19, 1919, whereby for a valuable consideration he forever relinquished any and all claims to her real and personal estate then owned by her or thereafter owned by her. To avoid this contract plaintiff asserts that it was a separation agreement, void as against public policy, and if not void, is unequitable and unfair, and should not be enforced in equity; and besides plaintiff and his deceased wife became reconciled to each other and their reconciliation abrogated this contract. The main contention is that the contract, even if valid, was abrogated and rescinded by the subsequent reconciliation. The circuit court found no equity in the bill and dismissed it. Plaintiff appeals.

Was there a reconciliation and resumption of the martial relations which will justify a court in finding that the parties intended thereby to revoke and annul the contract? Waiving the objection to the husband's testimony as incompetent, we

find that while the wife was in Cincinnati and perhaps before that time efforts had been begun through mutual friends for a reconciliation and resumption of the marital status. The wife appeared to be willing to forgive and forget and desired to go back to and live with her husband. Her letters to him from Cincinnati so indicate. Prior to that time she had deeded to one of her relatives her real estate, fearing threatened litigation from the wife of the man who apparently was the cause of the estrangement and separation; and it was thought best to keep secret the reconciliation until such time as the title to the property was deeded back to her. When she returned to Huntington, their plans were discussed. and it appears to have. been the understanding that after her husband had completed an apartment house he was then building, and his business was arranged, they would resume their marital relations and would go to Florida for the winter. While in Huntington she lived at her home at 210 Fourth Avenue, and he lived at his apartments about ten blocks away. She visited him at his office and sometimes at his apartment, but he never went to her home. There is no evidence that they cohabited together after their separation. There is evidence that he hesitated about becoming reconciled. That he did become reconciled and intended to live with her after the beginning of the year 1923 is found in his evidence alone. There is evidence that the day before she took violently ill, (about a week before her death), she declared that he had not spoken to her since she had returned, and she intended never to have anything more to do with him; and that on her death bed she said that she had made a will which she had destroyed because she wanted her property divided more equally, and she wanted him to have something. She did not make another will. This evidence relating to her displeasure with him, and that she wanted him to have something out of her estate, comes from a niece, Mrs. Mollie Sanford, one of her heirs and distributees, and who resided with. her in her home after the separation and until the time of her death. No objection or exception appears to have been taken to her evidence. It is reasonably clear that the husband and wife intended to live together as man and

wife at a future period. While it does not appear when the property was deeded back to her from her relative, it does appear that this was not the only reason that prevented the resumption of married life. Just why the actual resumption was delayed does not appear, unless it was to meet the business convenience of the husband. So far as the immediate relatives of the parties and the general public knew, there had been no reconciliation, and it is clear that there had been no resumption of conjugal relations at the time of her death. It will be observed that no reference is made to the contract during the negotiations for reconciliation or to the status of her property. In one of her letters she says that she had her property rented for $330.00 per month and that they had both worked hard for what they had and the income was sufficient and that they should spend and enjoy it together.

Plaintiff takes the position that the contract of September 19, 1919, is a separation agreement and is void as against public policy. We cannot see that the contract is a separation agreement. The parties had already separated and were living separate and apart. The contract is a mutual adjustment and settlement of their respective property rights. It recites the fact that they are living separate and apart and that they are desirous of adjusting and settling their respective marital rights of property, and all other rights of property which they may have in the property of each other. Plaintiff, for a consideration of five shares of bank stock owned by his wife, and three shares of other bank stock owned by her which shall go to him or his heirs at her death (she drawing the dividends on the three shares during her life), releases to her and her heirs all his curtesy rights in any of her real estate, and all rights to her and her heirs in any property real or personal which she then has or thereafter may acquire; while the wife releases her dower interest in all his lands then owned or thereafter acquired, and releases all claims for maintenance for all future time. The intention and purpose of this agreement is specifically stated at the end of the contract as follows: ''It is understood and agreed that this indenture is a complete settlement of the respective property rights of the parties hereto in the property real and personal,

of the other spouse, of which they now be owner or which they may hereafter acquire ownership at any time in the future.'' While the contract may have been induced because the parties had separated, the agreement is for the purpose of adjusting their property rights. Even though they had not separated such a contract, if equitable and fair, may be enforced in equity. Courts of law will not recognize and enforce contracts made between husband and wife. The cases relied upon by appellant to sustain the proposition that the contract was void, namely, *Bolyard* v. *Bolyard,* 79 W. Va. 554 and cases there cited, hold that contracts between husband and wife cannot be enforced in a court of law. It is stated in the *Bolyard* case that while courts of law regarded contracts between husband and wife as an impossibility, yet, ''In equity, however, fair and reasonable contracts between them were recognized and enforced.'' Generally where the contract is just and reasonable, and the utmost fairness has been shown to the wife, therein, and it would be good at law when made with trustees for the wife, it will be sustained in equity. Schouler on Marriage, Divorce and Domestic Relations, Vol. 1 (6th Ed.), page 549, Sec. 539. By Sec. 16, Chap. 65, Code, a husband may accept from his wife personal or real property in lieu of his curtesy. If he does accept the contract stands, and the curtesy is barred. Can it be doubted that a contract between husband and wife for surrender of the right of curtesy cannot be enforced? However, it is argued by appellant that the contract was not reasonable and fair to him, and it should not be enforced for that reason. It is not pointed out wherein it was not reasonable or fair. The parties had separated and were dealing at arms length. She relinquished her right to support and maintenance and to dower in exchange for relinquishment of his curtesy in her separate real estate, and interest in her personalty, giving him in addition thereto a valuable consideration in bank stocks. The relative value of the rights mutually relinquished is not attempted to be shown. It does not appear what real estate he owned at the time, or its value, although he had some and was then engaged in buying and selling real estate. It is further shown that he had accumulated property at the time of her death of very considerable value. We find nothing in the evidence which would in-

dicate that the husband was cheated, defrauded or imposed upon by the wife in making the contract. He was sui juris, and appears to have been a capable business man.

Appellant's main contention is that even if the contract can be enforced, and is fair and equitable, the subsequent reconciliation of the parties abrogated and rescinded it. Reliance is had upon *Smith* v. *King*, (N. C.) 12 S. E. 57; *Archbell* v. *Archbell*, 158 N. C. 408; *In re Singer's Estate*, 233 Pa. St. 55, Ann. Cases 1913 A, page 1331; *Kefauver* v. *Kefauver*, 22 Ky. Law 386; *Roberts* v. *Hardy*, 89 Mo. App. 86; *Tillman* v. *Tillman*, 84 S. C. 552; and cases of similar import. It will be observed that in these cases separation agreements were involved, and the reconciliation and resumption of cohabitation was held to abrogate the contracts having *separation* as the foundation. There seems to be a distinction between mere separation agreements, and post nuptial settlement of property rights. If in a separation agreement there is a separttion settlement of property rights based on independent consideration and which may have been made had there been no separation, it appears not to be terminated as a matter of law simply because the parties become reconciled, and live together again. While reconciliation and resumption of marital relations and duties will abrogate the separation agreement so far as the consideration therefor consists in the agreement to live apart, the resumption of the marriage relation does not rescind a part of the agreement based on an independent consideration. *Baird* v. *Connel et al.*, 121 Iowa 278, 96 N. W. 863; *Negus* v. *Forster*, 46 L. T. N. S. 675, where Lord Brett said, "Where the deed is made to depend upon other matters than the continuance of separation, the liability continues whatever takes place between husband and wife." To the same effect is *Randle* v. *Gould*, 8 El. & Bl. 457; *Smith* v. *Terry*, 38 App. Div. 394, 56 N. Y. Supp. 447, affirmed in 166 N. Y. 632, 60 N. E. 1120; Schouler on Marriage etc., Vol. 2 (6th Ed.), page 1561, Sec. 1312, where the author says: "When the contract contains provisions for the wife which might with equal propriety have been made had no separation been contemplated, and others which otherwise would have been idle, the coming together again of the parties and their conduct may be such as to show an intention to avoid the lat-

ter and not the former. So where the agreement for separation includes a division of property which might have been made had no separation taken place the reconciliation does not abrogate this division." Had the parties in the instant case actually resumed cohabitation and the discharge of all the duties incident to the marriage relation, thus carrying out in fact the alleged reconciliation, we can find nothing in the record to evidence an intention to readjust their respective property rights. The case of *Dennis* v. *Perkins,* 88 Kan. 428 is illuminating on the point under consideration. Dennis and wife entered into a separation agreement whereby the husband, owning all of the real estate, the wife having no separate property, agreed to and did deed to her a dwelling house and lot and released any claim to any right in property which she might thereafter acquire, giving to her also $500.00 and her clothing and jewelry; on her part the wife released all claims to any of the husband's property then owned or afterwards acquired, and released him from his marital obligation to maintain and support her. This agreement was signed on Aug. 2, 1909. The wife being in ill health went to her sister in Indiana where she died on the 1st day of February, 1910. In November before her death negotiations for reconciliation were begun, ending by a renewal of conjugal relations and a full reconciliation. He went to her in January and they rented a house, and lived together occupying the same room and bed for a week, when she became ill, and was taken to a hospital where she died. She had said to a witness that they had bought the property and worked for it, and when she was done with it, it should go back to him. He was with her when she died, paid the funeral expenses out of her money, and retained the small balance left. He sued, alleging that the separation agreement became void upon reconciliation and resumption of marital relations, the consideration for the contract having failed. The court held that these facts were not sufficient to show that the parties themselves regarded the property division as abrogated, and refused to set it aside. Many decisions are cited to sustain the court's conclusion. In the case before us, there was no resumption of marital obligations and duties, no living together as man and wife. It was evidently expected by her that they would do

so in the near future. She regarded the property as her own, collecting and using the rents until her death. She had complained just a week before her death that he had not spoken to her after she came back from Charlottesville, and declared she would have nothing further to do with him. He became much concerned when she was on her death bed and expressed the fear that he had contributed to the cause of her death. The contemplated resumption of marital relations may never have taken place. Whether we consider plaintiff's evidence, or discard it as incompetent under Sec. 23, Chap. 130 of the Code, we are of the opinion that such a complete reconciliation and resumption of marital relations has not been shown as will justify rescission and cancellation of the contract. The decree will be affirmed.

*Affirmed.*